(Slip Opinion) OCTOBER TERM, 2010 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BOND *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 09–1227. Argued February 22, 2011—Decided June 16, 2011

When petitioner Bond discovered that her close friend was pregnant by Bond's husband, she began harassing the woman. The woman suffered a minor burn after Bond put caustic substances on objects the woman was likely to touch. Bond was indicted for violating 18 U. S. C. §229, which forbids knowing possession or use, for nonpeaceful purposes, of a chemical that "can cause death, temporary incapacitation or permanent harm to humans," §§229(a); 229F(1); (7); (8), and which is part of a federal Act implementing a chemical weapons treaty ratified by the United States. The District Court denied Bond's motion to dismiss the §229 charges on the ground that the statute exceeded Congress' constitutional authority to enact. She entered a conditional guilty plea, reserving the right to appeal the ruling on the statute's validity. She did just that, renewing her Tenth Amendment claim. The Third Circuit, however, accepted the Government's position that she lacked standing. The Government has since changed its view on Bond's standing.

*Held:* Bond has standing to challenge the federal statute on grounds that the measure interferes with the powers reserved to States. Pp. 3–14.

   (a) The Third Circuit relied on a single sentence in *Tennessee Elec. Power Co.* v. *TVA*, 306 U. S. 118. Pp. 3–8.

    (1) The Court has disapproved of *Tennessee Electric* as authoritative for purposes of Article III's case-or-controversy requirement. See *Association of Data Processing Service Organizations, Inc.* v. *Camp*, 397 U. S. 150, 152–154. Here, Article III's standing requirement had no bearing on Bond's capacity to assert defenses in the District Court. And Article III's prerequisites are met with regard to her standing to appeal. Pp. 3–5.

(2) *Tennessee Electric* is also irrelevant with respect to prudential standing rules. There, the Court declined to reach the merits where private power companies sought to enjoin the federally chartered Tennessee Valley Authority (TVA) from producing and selling electric power, claiming that the statute creating the TVA exceeded the National Government's powers in violation of the Tenth Amendment. In doing so, the Court repeatedly stated that the problem with the power companies' suit was a lack of "standing" or a "cause of action," treating those concepts as interchangeable. *E.g.*, 306 U. S., at 139. The question whether a plaintiff states a claim for relief typically "goes to the merits" of a case, however, not to the dispute's justiciability, *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 92, and conflation of the two concepts can cause confusion. This happened with *Tennessee Electric*'s Tenth Amendment discussion. The statement on which the Third Circuit relied here, see 306 U. S., at 144, should be read to refer to the absence of a cause of action for injury caused by economic competition. To the extent the statement might instead be read to suggest a private party does not have standing to raise a Tenth Amendment issue, it is inconsistent with this Court's later precedents and should be deemed neither controlling nor instructive on the issue of standing as that term is now defined and applied. Pp. 5–8.

(b) *Amicus,* appointed to defend the judgment, contends that for Bond to argue the National Government has interfered with state sovereignty in violation of the Tenth Amendment is to assert only a State's legal rights and interests. But in arguing that the Government has acted in excess of the authority that federalism defines, Bond seeks to vindicate her own constitutional interests. Pp. 8–14.

(1) Federalism has more than one dynamic. In allocating powers between the States and National Government, federalism " 'secures to citizens the liberties that derive from the diffusion of sovereign power,' " *New York* v. *United States*, 505 U. S. 144, 181. It enables States to enact positive law in response to the initiative of those who seek a voice in shaping the destiny of their own times, and it protects the liberty of all persons within a State by ensuring that law enacted in excess of delegated governmental power cannot direct or control their actions. See *Gregory* v. *Ashcroft*, 501 U. S. 452, 458. Federalism's limitations are not therefore a matter of rights belonging only to the States. In a proper case, a litigant may challenge a law as enacted in contravention of federalism, just as injured individuals may challenge actions that transgress, *e.g.,* separation-of-powers limitations, see, *e.g., INS* v. *Chadha*, 462 U. S. 919. The claim need not depend on the vicarious assertion of a State's constitutional interests, even if those interests are also implicated. Pp. 8–12.

(2) The Government errs in contending that Bond should be permitted to assert only that Congress could not enact the challenged statute under its enumerated powers but that standing should be denied if she argues that the statute interferes with state sovereignty. Here, Bond asserts that the public policy of the Pennsylvania, enacted in its capacity as sovereign, has been displaced by that of the National Government.  The law to which she is subject, the prosecution she seeks to counter, and the punishment she must face might not have come about had the matter been left for Pennsylvania to decide.  There is no support for the Government's proposed distinction between different federalism arguments for purposes of prudential standing rules. The principles of limited national powers and state sovereignty are intertwined.  Impermissible interference with state sovereignty is not within the National Government's enumerated powers, and action exceeding the National Government's enumerated powers undermines the States' sovereign interests.  Individuals seeking to challenge such measures are subject to Article III and prudential standing rules applicable to all litigants and claims, but here, where the litigant is a party to an otherwise justiciable case or controversy, she is not forbidden to object that her injury results from disregard of the federal structure of the Government.  Pp. 12–14.

(c) The Court expresses no view on the merits of Bond's challenge to the statute's validity.  P. 14.

581 F. 3d 128, reversed and remanded.

KENNEDY, J., delivered the opinion for a unanimous Court.  GINSBURG, J., filed a concurring opinion, in which BREYER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 09–1227

————

## CAROL ANNE BOND, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

[June 16, 2011]

JUSTICE KENNEDY delivered the opinion of the Court.

This case presents the question whether a person indicted for violating a federal statute has standing to challenge its validity on grounds that, by enacting it, Congress exceeded its powers under the Constitution, thus intruding upon the sovereignty and authority of the States.

The indicted defendant, petitioner here, sought to argue the invalidity of the statute. She relied on the Tenth Amendment, and, by extension, on the premise that Congress exceeded its powers by enacting it in contravention of basic federalism principles. The statute, 18 U. S. C. §229, was enacted to comply with a treaty; but petitioner contends that, at least in the present instance, the treaty cannot be the source of congressional power to regulate or prohibit her conduct.

The Court of Appeals held that because a State was not a party to the federal criminal proceeding, petitioner had no standing to challenge the statute as an infringement upon the powers reserved to the States. Having concluded that petitioner does have standing to challenge the federal statute on these grounds, this Court now reverses that

determination. The merits of petitioner's challenge to the statute's validity are to be considered, in the first instance, by the Court of Appeals on remand and are not addressed in this opinion.

I

This case arises from a bitter personal dispute, leading to the criminal acts charged here. Petitioner Carol Anne Bond lived outside Philadelphia, Pennsylvania. After discovering that her close friend was pregnant and that the father was Bond's husband, Bond sought revenge. Bond subjected the woman to a campaign of harassing telephone calls and letters, acts that resulted in a criminal conviction on a minor state charge. Bond persisted in her hostile acts, placing caustic substances on objects the woman was likely to touch, including her mailbox, car door handle, and front doorknob. Bond's victim suffered a minor burn on her hand and contacted federal investigators, who identified Bond as the perpetrator.

Bond was indicted in the United States District Court for the Eastern District of Pennsylvania for, among other offenses, two counts of violating §229. Section 229 forbids knowing possession or use of any chemical that "can cause death, temporary incapacitation or permanent harm to humans or animals" where not intended for a "peaceful purpose." §§229(a); 229F(1); (7); (8). The statute was enacted as part of the Chemical Weapons Convention Implementation Act of 1998, 112 Stat. 2681–856, 22 U. S. C. §6701 *et seq.;* 18 U. S. C. §229 *et seq.* The Act implements provisions of the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on their Destruction, a treaty the United States ratified in 1997.

In the District Court, Bond moved to dismiss the §229 charges, contending the statute was beyond Congress' constitutional authority to enact. The District Court

denied the motion. Bond entered a conditional plea of guilty, reserving the right to appeal the ruling on the validity of the statute. She was sentenced to six years in prison.

In the Court of Appeals for the Third Circuit, Bond renewed her challenge to the statute, citing, among other authorities, the Tenth Amendment to the Constitution. The Court of Appeals asked for supplemental briefs on the question whether Bond had standing to raise the Tenth Amendment as a ground for invalidating a federal statute in the absence of a State's participation in the proceedings.

In its supplemental brief in the Court of Appeals, the Government took the position that Bond did not have standing. The Court of Appeals agreed. 581 F. 3d 128 (2009).

When Bond sought certiorari, the Government advised this Court that it had changed its position and that, in its view, Bond does have standing to challenge the constitutionality of §229 on Tenth Amendment grounds. See Brief for United States (filed July 9, 2010). The Court granted certiorari, 562 U. S. \_\_\_ (2010), and appointed an *amicus curiae* to defend the judgment of the Court of Appeals. Stephen McAllister, a member of the bar of this Court, filed an *amicus* brief and presented an oral argument that have been of considerable assistance to the Court.

## II

To conclude that petitioner lacks standing to challenge a federal statute on grounds that the measure interferes with the powers reserved to States, the Court of Appeals relied on a single sentence from this Court's opinion in *Tennessee Elec. Power Co.* v. *TVA*, 306 U. S. 118 (1939). See 581 F. 3d, at 136–138. As the Court of Appeals noted here, other Courts of Appeals have taken a similar approach. *E.g., United States* v. *Hacker*, 565 F.3d 522, 525–527 (CA8 2009); *Oregon* v. *Legal Servs. Corp.*, 552 F. 3d

965, 971–972 (CA9 2009); *Brooklyn Legal Servs. Corp.* v. *Legal Servs. Corp.*, 462 F. 3d 219, 234–235 (CA2 2006); *Medeiros* v. *Vincent*, 431 F. 3d 25, 33–36 (CA1 2005); *United States* v. *Parker*, 362 F. 3d 1279, 1284–1285 (CA10 2004). That approach is in tension, if not conflict, with decisions of some other Courts of Appeals. See *Gillespie* v. *Indianapolis*, 185 F. 3d 693, 700–704 (CA7 1999); *Metro-lina Family Practice Group, P. A.* v. *Sullivan*, 767 F. Supp. 1314 (WDNC 1989), aff'd 929 F. 2d 693 (CA4 1991); *At-lanta Gas Light Co.* v. *United States Dept. of Energy*, 666 F. 2d 1359, 1368, n. 16 (CA11 1982); see also *United States* v. *Johnson*, 632 F. 3d 912, 918–921 (CA5 2011) (reserving issue); *Lomont* v. *O'Neill*, 285 F. 3d 9, 14, n. 5 (CADC 2002) (same); *Nance* v. *EPA*, 645 F. 2d 701, 716 (CA9 1981) (same).

*Tennessee Electric* is the appropriate place to begin. It should be clear that *Tennessee Electric* does not cast doubt on Bond's standing for purposes of Article III's case-or-controversy requirement. This Court long ago disap-proved of the case as authoritative respecting Article III limitations. *Association of Data Processing Service Or-ganizations, Inc.* v. *Camp*, 397 U. S. 150, 152–154 (1970). In the instant case, moreover, it is apparent—and in fact conceded not only by the Government but also by *amicus*—that Article III poses no barrier. One who seeks to initiate or continue proceedings in federal court must demonstrate, among other requirements, both standing to obtain the relief requested, see *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992), and, in addition, an "ongoing interest in the dispute" on the part of the opposing party that is sufficient to establish "concrete adverseness." *Camreta* v. *Greene*, 563 U. S. ___, ___ (2011) (slip op., at 5) (internal quotation marks omitted). When those conditions are met, Article III does not restrict the opposing party's ability to object to relief being sought at its expense. The requirement of Article III standing thus

had no bearing upon Bond's capacity to assert defenses in the District Court. As for Bond's standing to appeal, it is clear Article III's prerequisites are met. Bond's challenge to her conviction and sentence "satisfies the case-or-controversy requirement, because the incarceration . . . constitutes a concrete injury, caused by the conviction and redressable by invalidation of the conviction." *Spencer* v. *Kemna*, 523 U. S. 1, 7 (1998).

To resolve the case, this Court must consider next whether *Tennessee Electric* is irrelevant with respect to prudential rules of standing as well. The question in *Tennessee Electric* was whether a group of private power companies could bring suit to enjoin the federally chartered Tennessee Valley Authority (TVA) from producing and selling electric power. It was conceded that competition from the TVA would "inflict substantial damage" upon the power companies. 306 U. S., at 137. According to the companies, the federal statute authorizing the creation and operation of the TVA was invalid because, among other reasons, it exceeded the powers of the National Government in violation of the Tenth Amendment.

Declining to reach the merits, the Court concluded the power companies' lawsuit should be dismissed. It explained that the suit was premised on the principle that a person threatened with injury by conduct "which, but for statutory authority for its performance, would be a violation of his legal rights" could request an injunction from a court of equity and by this means test the validity of the statute. *Ibid.* But the Court concluded that the TVA, even if it were shorn of congressional statutory authority, had done nothing more than compete as a supplier of electricity. *Id.*, at 138. And since state law did not purport to grant any of the power companies a monopoly, there was no basis for a suit in which the TVA might be forced to invoke its congressional authorization. *Id.*, at 138–143.

In that part of its analysis, and throughout its opinion, the *Tennessee Electric* Court stated that the problem with the power companies' suit was a lack of "standing" or a "cause of action." It treated those concepts as interchangeable. *E.g.*, *id.*, at 139 (no "standing" because no "legal cause of complaint"); *id.*, at 139–140 (no "standing" without "a cause of action or a right to sue"); *id.*, at 142 ("no standing," no "right to sue for an injunction"); *id.*, at 144 (no Tenth Amendment "standing" and no Ninth Amendment "cause of action" for same reasons); see also Bellia, Article III and the Cause of Action, 89 Iowa L. Rev. 777, 826–830 (2004).

Even though decisions since *Tennessee Electric* have been careful to use the terms "cause of action" and "standing" with more precision, the distinct concepts can be difficult to keep separate. If, for instance, the person alleging injury is remote from the zone of interests a statute protects, whether there is a legal injury at all and whether the particular litigant is one who may assert it can involve similar inquiries. *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 96–97, and n. 2 (1998) (noting that statutory standing and the existence of a cause of action are "closely connected" and "sometimes identical" questions).

Still, the question whether a plaintiff states a claim for relief "goes to the merits" in the typical case, not the justiciability of a dispute, *id.*, at 92, and conflation of the two concepts can cause confusion. This is the case with the Tenth Amendment discussion in *Tennessee Electric*. The *Tennessee Electric* Court noted that "[a] distinct ground upon which standing to maintain the suit is said to rest is that the acts of the Authority cannot be upheld without permitting federal regulation of purely local matters reserved to the states or the people by the Tenth Amendment." 306 U. S., at 143. The Court rejected the argument, however, concluding the Tenth Amendment did not

give one business a right to keep another from compet-
ing. *Id.*, at 144. ("The sale of government property in
competition with others is not a violation of the Tenth
Amendment").

The Court then added the sentence upon which the
Court of Appeals relied in the instant case, the sentence
that has been the source of disagreement among Courts of
Appeals:

> "As we have seen there is no objection to the Author-
> ity's operations by the states, and, if this were not so,
> the appellants, absent the states or their officers, have
> no standing in this suit to raise any question under
> the amendment." *Ibid.*

The quoted statement was in the context of a decision
which held that business competitors had no legal injury,
and the word standing can be interpreted in that sense.
On this reading, the statement reiterated an earlier point.
The statement explained that the States in which the TVA
operated exempted it from their public utilities regula-
tions; and that even if the States had not done so and the
TVA had violated those regulations, the regulations were
for the States to enforce. See *id.*, at 141–142. They con-
ferred no private right of action on business competitors.
This reading is consistent with the *Tennessee Electric*
Court's use of the term "standing" elsewhere in its opinion
to refer to the existence of a state-law cause of action. A
holding that state utilities regulations did not supply a
cause of action against a competitor is of no relevance to
the instant case, and we need not explore all of its implica-
tions. See also *Data Processing*, 397 U. S., at 157–158
(cause of action under the Administrative Procedure Act, 5
U. S. C. §702, permits suit based on injury from business
competition).

Yet the quoted statement also could be read to refer to
standing in the sense of whether the power companies

were the proper litigants to raise a Tenth Amendment is-
sue. To the extent that might have been the intention of
the *Tennessee Electric* Court, it is, for reasons to be ex-
plained, inconsistent with our later precedents. The sen-
tence from *Tennessee Electric* that we have quoted and
discussed should be deemed neither controlling nor in-
structive on the issue of standing as that term is now
defined and applied.

## III

*Amicus* contends that federal courts should not adjudi-
cate a claim like Bond's because of the prudential rule that
a party "generally must assert his own legal rights and
interests, and cannot rest his claim to relief on the legal
rights or interests of third parties." *Warth* v. *Seldin*, 422
U. S. 490, 499, 500 (1975); see also *Kowalski* v. *Tesmer*,
543 U. S. 125, 129–130 (2004). In *amicus*' view, to argue
that the National Government has interfered with state
sovereignty in violation of the Tenth Amendment is to
assert the legal rights and interests of States and States
alone. That, however, is not so. As explained below, Bond
seeks to vindicate her own constitutional interests. The
individual, in a proper case, can assert injury from gov-
ernmental action taken in excess of the authority that
federalism defines. Her rights in this regard do not belong
to a State.

## A

The federal system rests on what might at first seem a
counterintuitive insight, that "freedom is enhanced by the
creation of two governments, not one." *Alden* v. *Maine*,
527 U. S. 706, 758 (1999). The Framers concluded that
allocation of powers between the National Government
and the States enhances freedom, first by protecting the
integrity of the governments themselves, and second by
protecting the people, from whom all governmental powers

are derived.

Federalism has more than one dynamic. It is true that the federal structure serves to grant and delimit the prerogatives and responsibilities of the States and the National Government vis-à-vis one another. The allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States. The federal balance is, in part, an end in itself, to ensure that States function as political entities in their own right.

But that is not its exclusive sphere of operation. Federalism is more than an exercise in setting the boundary between different institutions of government for their own integrity. "State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *New York* v. *United States*, 505 U. S. 144, 181 (1992) (quoting *Coleman* v. *Thompson*, 501 U. S. 722, 759 (1991) (Blackmun, J., dissenting)).

Some of these liberties are of a political character. The federal structure allows local policies "more sensitive to the diverse needs of a heterogeneous society," permits "innovation and experimentation," enables greater citizen "involvement in democratic processes," and makes government "more responsive by putting the States in competition for a mobile citizenry." *Gregory* v. *Ashcroft*, 501 U. S. 452, 458 (1991). Federalism secures the freedom of the individual. It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power. True, of course, these objects cannot be vindicated by the Judiciary in the absence of a proper case or controversy; but the individual liberty secured by federalism is not simply derivative of the rights of the States.

Federalism also protects the liberty of all persons within

a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. See *ibid.* By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power. When government acts in excess of its lawful powers, that liberty is at stake.

The limitations that federalism entails are not therefore a matter of rights belonging only to the States. States are not the sole intended beneficiaries of federalism. See *New York*, *supra*, at 181. An individual has a direct interest in objecting to laws that upset the constitutional balance between the National Government and the States when the enforcement of those laws causes injury that is concrete, particular, and redressable. Fidelity to principles of federalism is not for the States alone to vindicate.

The recognition of an injured person's standing to object to a violation of a constitutional principle that allocates power within government is illustrated, in an analogous context, by cases in which individuals sustain discrete, justiciable injury from actions that transgress separation-of-powers limitations. Separation-of-powers principles are intended, in part, to protect each branch of government from incursion by the others. Yet the dynamic between and among the branches is not the only object of the Constitution's concern. The structural principles secured by the separation of powers protect the individual as well.

In the precedents of this Court, the claims of individuals—not of Government departments—have been the principal source of judicial decisions concerning separation of powers and checks and balances. For example, the requirement that a bill enacted by Congress be presented to the President for signature before it can become law gives the President a check over Congress' exercise of legislative power. See U. S. Const., Art. I, §7. Yet individuals, too, are protected by the operations of separation

of powers and checks and balances; and they are not disabled from relying on those principles in otherwise justiciable cases and controversies. In *INS* v. *Chadha*, 462 U. S. 919 (1983), it was an individual who successfully challenged the so-called legislative veto—a procedure that Congress used in an attempt to invalidate an executive determination without presenting the measure to the President. The procedure diminished the role of the Executive, but the challenger sought to protect not the prerogatives of the Presidency as such but rather his own right to avoid deportation under an invalid order. Chadha's challenge was sustained. A cardinal principle of separation of powers was vindicated at the insistence of an individual, indeed one who was not a citizen of the United States but who still was a person whose liberty was at risk.

*Chadha* is not unique in this respect. Compare *Clinton* v. *City of New York*, 524 U. S. 417, 433–436 (1998) (injured parties have standing to challenge Presidential line-item veto) with *Raines* v. *Byrd*, 521 U. S. 811, 829–830 (1997) (Congress Members do not); see also, *e.g.*, *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. \_\_\_ (2010); *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211 (1995); *Bowsher* v. *Synar*, 478 U. S. 714 (1986); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50 (1982); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579 (1952); *A. L. A. Schechter Poultry Corp.* v. *United States*, 295 U. S. 495 (1935). If the constitutional structure of our Government that protects individual liberty is compromised, individuals who suffer otherwise justiciable injury may object.

Just as it is appropriate for an individual, in a proper case, to invoke separation-of-powers or checks-and-balances constraints, so too may a litigant, in a proper case, challenge a law as enacted in contravention of constitutional principles of federalism. That claim need not

depend on the vicarious assertion of a State's constitutional interests, even if a State's constitutional interests are also implicated.

## B

In this regard it is necessary to address a misconception in the position the Government now urges this Court to adopt. As noted, the Government agrees that petitioner has standing to challenge the validity of §229. That concession, however, depends on describing petitioner's claim in a narrow way. The Government contends petitioner asserts only that Congress could not enact the challenged statute under its enumerated powers. Were she to argue, the Government insists, that the statute "interferes with a specific aspect of state sovereignty," either instead of or in addition to her enumerated powers contention, the Court should deny her standing. Brief for United States 18 (filed Dec. 3, 2010).

The premise that petitioner does or should avoid making an "interference-with-sovereignty" argument is flawed. *Id.*, at 33. Here she asserts, for example, that the conduct with which she is charged is "local in nature" and "should be left to local authorities to prosecute" and that congressional regulation of that conduct "signals a massive and unjustifiable expansion of federal law enforcement into state-regulated domain." Record in No. 2:07–cr–00528–JG–1 (ED Pa.), Doc. 27, pp. 6, 19. The public policy of the Commonwealth of Pennsylvania, enacted in its capacity as sovereign, has been displaced by that of the National Government. The law to which petitioner is subject, the prosecution she seeks to counter, and the punishment she must face might not have come about if the matter were left for the Commonwealth of Pennsylvania to decide. Indeed, petitioner argues that under Pennsylvania law the expected maximum term of imprisonment she could have received for the same conduct was barely more than a

third of her federal sentence.

There is no basis to support the Government's proposed distinction between different federalism arguments for purposes of prudential standing rules. The principles of limited national powers and state sovereignty are intertwined. While neither originates in the Tenth Amendment, both are expressed by it. Impermissible interference with state sovereignty is not within the enumerated powers of the National Government, see *New York*, 505 U. S., at 155–159, and action that exceeds the National Government's enumerated powers undermines the sovereign interests of States. See *United States* v. *Lopez*, 514 U. S. 549, 564 (1995). The unconstitutional action can cause concomitant injury to persons in individual cases.

An individual who challenges federal action on these grounds is, of course, subject to the Article III requirements, as well as prudential rules, applicable to all litigants and claims. Individuals have "no standing to complain simply that their Government is violating the law." *Allen* v. *Wright*, 468 U. S. 737, 755 (1984). It is not enough that a litigant "suffers in some indefinite way in common with people generally." *Frothingham* v. *Mellon*, 262 U. S. 447, 488 (1923) (decided with *Massachusetts* v. *Mellon*). If, in connection with the claim being asserted, a litigant who commences suit fails to show actual or imminent harm that is concrete and particular, fairly traceable to the conduct complained of, and likely to be redressed by a favorable decision, the Federal Judiciary cannot hear the claim. *Lujan*, 504 U. S., at 560–561. These requirements must be satisfied before an individual may assert a constitutional claim; and in some instances, the result may be that a State is the only entity capable of demonstrating the requisite injury.

In this case, however, where the litigant is a party to an otherwise justiciable case or controversy, she is not forbidden to object that her injury results from disregard of the

federal structure of our Government. Whether the Tenth Amendment is regarded as simply a "'truism,'" *New York*, *supra*, at 156 (quoting *United States* v. *Darby*, 312 U. S. 100, 124 (1941)), or whether it has independent force of its own, the result here is the same.

\* \* \*

There is no basis in precedent or principle to deny petitioner's standing to raise her claims. The ultimate issue of the statute's validity turns in part on whether the law can be deemed "necessary and proper for carrying into Execution" the President's Article II, §2 Treaty Power, see U. S. Const., Art. I, §8, cl. 18. This Court expresses no view on the merits of that argument. It can be addressed by the Court of Appeals on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 09–1227

## CAROL ANNE BOND, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[June 16, 2011]

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring.

I join the Court's opinion and write separately to make the following observation. Bond, like any other defendant, has a personal right not to be convicted under a constitutionally invalid law. See Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1331–1333 (2000); Monaghan, Overbreadth, 1981 Sup. Ct. Rev. 1, 3. See also *North Carolina* v. *Pearce*, 395 U. S. 711, 739 (1969) (Black, J., concurring in part and dissenting in part) ("Due process . . . is a guarantee that a man should be tried and convicted only in accordance with valid laws of the land.").

In this case, Bond argues that the statute under which she was charged, 18 U. S. C. §229, exceeds Congress' enumerated powers and violates the Tenth Amendment. Other defendants might assert that a law exceeds Congress' power because it violates the Ex Post Facto Clause, or the Establishment Clause, or the Due Process Clause. Whatever the claim, success on the merits would require reversal of the conviction. "An offence created by [an unconstitutional law]," the Court has held, "is not a crime." *Ex parte Siebold*, 100 U. S. 371, 376 (1880). "A conviction under [such a law] is not merely erroneous, but is illegal and void, and cannot be a legal cause of impris-

onment." *Id.*, at 376–377. If a law is invalid as applied to the criminal defendant's conduct, the defendant is entitled to go free.

For this reason, a court has no "prudential" license to decline to consider whether the statute under which the defendant has been charged lacks constitutional application to her conduct. And that is so even where the constitutional provision that would render the conviction void is directed at protecting a party not before the Court. Our decisions concerning criminal laws infected with discrimination are illustrative. The Court must entertain the objection—and reverse the conviction—even if the right to equal treatment resides in someone other than the defendant. See *Eisenstadt* v. *Baird*, 405 U. S. 438, 452–455 (1972) (reversing conviction for distributing contraceptives because the law banning distribution violated the recipient's right to equal protection); cf. *Craig* v. *Boren*, 429 U. S. 190, 192, 210, and n. 24 (1976) (law penalizing sale of beer to males but not females aged 18 to 20 could not be enforced against vendor). See also *Grayned* v. *City of Rockford*, 408 U. S. 104, 107, n. 2 (1972); *Welsh* v. *United States*, 398 U. S. 333, 361–362 (1970) (Harlan, J., concurring in result) (reversal required even if, going forward, Congress would cure the unequal treatment by extending rather than invalidating the criminal proscription).

In short, a law "beyond the power of Congress," for any reason, is "no law at all." *Nigro* v. *United States*, 276 U. S. 332, 341 (1928). The validity of Bond's conviction depends upon whether the Constitution permits Congress to enact §229. Her claim that it does not must be considered and decided on the merits.